## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

SUNFLOWER ELECTRIC POWER
CORPORATION,

       *Plaintiff,*

  vs.                         Case No. 17-CV-1158-EFM

M&S STEEL, INC. and GLOBAL POWER
GENERATION SERVICE CORPORATION
OF FLORIDA d/b/a/ GLOBAL POWER
GENERATION SERVICES,

       *Defendants.*

### MEMORANDUM AND ORDER

Sunflower Electric Power Corporation ("Sunflower") filed a lawsuit against M&S Steel, Inc. ("M&S") and Global Power Generation Service Corporation of Florida d/b/a/ Global Power Generation Services ("GPGS") relating to the failure of a turbine used at Sunflower's Garden City, Kansas, facility. Sunflower's Complaint alleges various claims against each Defendant for breaches of contract, breaches of warranties, and negligence. M&S filed a four-count crossclaim against GPGS that seeks indemnification for all expenses, costs, and attorney fees associated with the present action and for any damages that may be awarded to Sunflower in this action. GPGS filed a motion to dismiss Counts I and II of M&S's crossclaim alleging that the indemnity provision in the parties' subcontract is unenforceable as it violates both K.S.A. § 16-121 and Kansas public

policy.  Because M&S has sufficiently pleaded Counts I and II, the Court denies GPGS's motion

to dismiss Counts I and II of M&S's crossclaim (Doc. 21).  The Court denies M&S's motion for

leave to supplement its response in opposition to GPGS's motion to dismiss (Doc. 59) as moot.

## I.    Factual and Procedural Background[1]

 Effective September 17, 2014, M&S entered into a Master Service Agreement ("MSA")

with Sunflower to perform work on an item of "personal property"—a General Electric Company,

MS7001, Frame 7, combustion turbine, S/N 248854 ("turbine")—at Sunflower's facility in Garden

City, Kansas.  M&S and GPGS entered a subcontract on October 30, 2014, whereunder GPGS

agreed to perform certain work on the turbine under the MSA.

The subcontract stated that the subcontractor "shall furnish the labor, materials, tools,

implements, design services, and/or other work and apparatus necessary to perform and complete

to Contractor's satisfaction and the Owner's [Sunflower] specifications the work described in

attached Exhibit B (the "Subcontract Work")."  Exhibit B states, in part:

> GPGS is please [sic] to provide one (1) full time Technical Consultant for the
> upcoming Sunflower Electric Power Corporation (SEPC) Garden City S-4 gas
> turbine combustion inspection and maintenance.  Additionally, M&S and
> GPGS have agreed to a profit sharing agreement based on the project sale,
> technical consulting and tools for the subject project as outline [sic] below.

> M&S / GPGS profit sharing agreement whereas M&S provides project
> mechanical labor, equipment, tools and GPGS provides the customer
> introduction, project sale, technical oversight, tools and equipment.

The subcontract contained an indemnity provision and certain insurance requirements.

These provisions provide, in part:

> 7.    **Indemnity by Subcontractor.**  To the fullest extent permitted
> by law, Subcontractor shall indemnify and hold Contractor, Owner, the Project

---

[1] The Court takes the following factual summary from the allegations in M&S's crossclaim against GPGS, and the contracts specifically referenced therein.

Architect, their agents, consultants and employees harmless from and against all claims, losses, costs and damages, including but not limited to attorneys' fees, pertaining to the performance of the Subcontract and involving personal injury, sickness, disease, death or property damage. This indemnification agreement is binding on the Subcontractor, to the fullest extent permitted by law, regardless of whether any or all of the persons and entities indemnified hereunder are responsible in part for the claims, damages, losses or expenses for which the Subcontractor is obligated to provide indemnification. This indemnification provision does not negate, abridge or reduce any other rights or obligations of the persons and entities described herein with respect to indemnity.

       8.    **Insurance Requirements.**  Subcontractor shall purchase and maintain Insurance of the following types of coverage and limits of liability:

       8.1.   *Commercial General Liability* (CGL) with limits of Insurance of not less than $1,000,000 each occurrence and $2,000,000 Annual Aggregate.

   . . . .

       8.1.4  Contractor, Owner and all other parties required of the General Contractor, shall be included as insureds on the CGL, using ISO Additional Insured Endorsement CG 20 10 11 85 or an endorsement(s) providing equivalent coverage to the additional insureds such as CG 2033 and CG 20 37. This insurance for the additional insureds shall be as broad as the coverage provided for the named insured subcontractor. It shall apply as Primary and Non-Contributing Insurance before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional Insured.

   . . . .

The MSA, entered between Sunflower and M&S, defines the scope of the agreement as an agreement "for the provision of furnishing qualified labor, experienced supervision, specialized tools, equipment, and material as may be necessary to perform services (Services) to Sunflower by Supplier as outlined in the specifications set forth in Exhibit B." The specifications attached to the MSA state that "[i]t is the intent and purpose of these specifications to describe in detail the S4 TURBINE COMBUSTION INSPECTION and GENERATOR TESTING. The inspection will include a combustion area inspection, generator testing and various technical information letters

(TIL) inspections."  The unit is described as "a General Electric Co., MS7001, Frame 7, combustion turbine S/N 248854 . . . designed to use natural gas and fuel oil.  Over the past years the only fuel source has been natural gas."

M&S and GPGS performed work on the turbine pursuant to the MSA from approximately November 3, 2014, to December 6, 2014, which included work on transition pieces, bolts, and lockplates.  Sunflower alleges that on August 6, 2015, the turbine suffered a catastrophic and sudden failure, and that the subsequent visual inspection revealed that transition pieces had failed, were no longer attached, were loose, or were missing a bolt and lockplate.  M&S alleges that GPGS's responsibilities under the subcontract included oversight, quality control, technical compliance, inspection, and supervision of the work performed on the turbine, that GPGS was the technical consultant and supervisory oversight for the work performed on the transition pieces, bolts, and lockplates, and that GPGS inspected the work performed on the transition pieces, bolts, and lockplates before the turbine returned to service.

In Count I, M&S alleges that GPGS was contractually obligated to indemnify, hold harmless, defend, and insure M&S from the claims and allegations asserted by Sunflower, and that GPGS breached the subcontract by failing and refusing to accept M&S's demands and tenders, failing and refusing to indemnify and hold harmless M&S against Sunflower's claims, failing to defend and/or provide a defense to M&S against Sunflower's claims, and failing to name M&S as an additional insured or provide M&S with insurance for at least three years after completion of the work complained of by Sunflower.  In Count II, M&S alleges that separate and apart from the subcontract, GPGS understood that it was to provide technical oversight, quality control, technical compliance, inspection, and supervision of the work complained of by Sunflower in its Complaint,

of which GPGS knew M&S was relying on GPGS to perform, and that M&S is expressly and impliedly entitled to indemnification from GPGS.

GPGS filed a motion to dismiss arguing that Counts I and II of M&S's crossclaim rely on provisions of a subcontract between M&S and GPGS that are against public policy, void, and unenforceable pursuant to K.S.A. § 16-121 and Kansas common law. Accordingly, GPGS argues, these Counts fail to state a claim upon which relief can be granted and should be dismissed.

## II.    Legal Standard

Under Rule 12(b)(6), a party may move for dismissal of "a claim for relief in any pleading" that fails to state a claim upon which relief can be granted. Upon such motion, the Court must decide "whether the [pleading] contains 'enough facts to state a claim to relief that is plausible on its face.' "[2] "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient;" rather, the pleading "must give the court reason to believe that *this* [party] has a reasonable likelihood of mustering factual support for *these* claims."[3] The Court does not "weigh potential evidence that the parties might present at trial," but assesses whether the pleading "alone is legally sufficient to state a claim for which relief may be granted."[4] In determining whether a claim is facially plausible, the Court must draw on its judicial experience and common sense.[5] All well-pleaded facts are assumed to be true and are construed

---

[2] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] *Ridge at Red Hawk*, 493 F.3d at 1177 (emphases in original).

[4] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation omitted).

[5] *Iqbal*, 556 U.S. at 679.

in the light most favorable to the non-moving party.[6]   Allegations that merely state legal conclusions, however, need not be accepted as true.[7]

### III.   Analysis[8]

**A.   K.S.A. § 16-121**

Kansas statutorily prohibits the inclusion of certain indemnification and insurance provisions in certain types of contracts.[9]   GPGS alleges that the subcontract between M&S and GPGS falls under this prohibition, and accordingly, because Counts I and II of M&S's crossclaim rely on provisions prohibited by Kansas law, these Counts fail as a matter of law.   M&S disputes this contention and argues that it has properly pleaded its causes of action under Counts I and II and, alternatively, that discovery must be conducted before the Court can declare, as a matter of law, that the subcontract at issue here is governed by K.S.A. § 16-121.

With certain limitations, § 16-121 provides than "[a]n indemnification provision in a contract which requires the promisor to indemnify the promisee for the promisee's negligence or intentional acts or omissions is against public policy and is void and unenforceable."[10]   Likewise, a contract provision "which requires a party to provide liability coverage to another party, as an

---

[6] *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697, 700 (10th Cir. 2014).

[7] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[8] Neither party addresses which state's law applies to this dispute, but both parties cite Kansas law in their briefs.   As the Court has not been presented with facts sufficient to demonstrate that another state's law should apply, it will analyze the issues presented under Kansas law.   *See Neustrom v. Union Pacific R. Co.*, 156 F.3d 1057, 1062 (10th Cir. 1998) (applying Kansas law where neither party addressed the issue of choice of law but both parties cited Kansas law).

[9] *See* K.S.A. § 16-121.

[10] K.S.A. § 16-121(b).   "Indemnification provision" is defined to mean "a covenant, promise, agreement, clause or understanding in connection with, contained in, or collateral to a contract that requires the promisor to hold harmless, indemnify or defend the promisee or others against liability for loss or damages."   K.S.A. § 16-121(a)(6).

-6-

additional insured, for such other party's own negligence or intentional acts or omissions is against public policy and is void and unenforceable."[11]  A "contract," for purposes of this statute, "means any construction contract, motor carrier transportation contract, dealer agreement or franchise agreement."[12]  The statute defines a construction contract as follows:

> "Construction contract" means an agreement for the design, construction, alteration, renovation, *repair or maintenance of a building, structure, highway, road, bridge, water line, sewer line, oil line, gas line, appurtenance or other improvement to real property*, including any moving, demolition or excavation, except that no deed, lease, easement, license or other instrument granting an interest in or the right to possess property shall be deemed to be a construction contract even if the instrument includes the right to design, construct, alter, renovate, repair or maintain improvements on such real property. "Construction contract" shall not include any design, construction, alteration, renovation, repair or maintenance of:
>
> (A) Dirt or gravel roads used to access oil and gas wells and associated facilities; or
>
> (B) oil flow lines or gas gathering lines used in association with the transportation of production from oil and gas wells from the wellhead to oil storage facilities or gas transmission lines.[13]

Before the Court may find the indemnification and insurance provisions in the subcontract as void under § 16-121, it must first determine that the subcontract constitutes a "construction contract" as defined by the statute.  It cannot do so at this stage in the proceedings.

GPGS asserts that the work described in the subcontract brings it within the purview of a "construction contract" because the subcontract specifically refers to "maintenance" and the turbine referenced in the subcontract "was a structure, appurtenance or other improvement to real

---

[11] K.S.A. § 16-121(c).  The statute also provides for circumstances where this general rule will not apply. Neither party argues that the subcontract at issue here presents such circumstances.

[12] K.S.A. § 16-121(a)(2).  Here, the parties dispute whether the subcontract constitutes a "construction contract."

[13] K.S.A. § 16-121(a)(1) (emphasis added).

property."  GPGS cites no legal support for its statement that the turbine in question constitutes a structure, appurtenance, or other improvement to real property.  Instead, it appears to arrive at this conclusion because the MSA states that the work will be performed at its Garden City, Kansas, facility "on a General Electric Co., MS7001, Frame 7, combustion turbine, S/N 248854, which was designed to use natural gas and fuel oil," and because the equipment required to perform the MSA includes forklifts, cranes, hoists, man lifts, and sky climbers, "which is indicative of the subject turbine's size and nature."  GPGS argues that the characteristics of the "turbine set forth in the pleadings and exhibits thereto clearly establish that the subject turbine was not simply personal property . . . but rather was a structure, appurtenance, or other improvement to real property."[14]

The minimal caselaw discussing § 16-121 provides little guidance to the Court, and each party merely offers conclusory assertions as to why the subcontract is or is not a construction contract subject to § 16-121(b).  While certain facts may suggest that the turbine is not a piece of personal property and movable equipment as alleged by M&S, the pleadings are wholly devoid of

---

[14] GPGS also argues that M&S's description in its pleading of the turbine as "personal property" is irrelevant because the statute does not expressly include or exclude personal property.  The Court rejects GPGS's argument that whether the turbine is "personal property" is irrelevant as to whether the turbine is a building, structure, oil line, gas line, appurtenance, or other improvement to real property.  Black's Law Dictionary defines personal property as "[a]ny *movable* or intangible thing that is subject to ownership *and not classified as real property*."  It defines movable as "[p]roperty that can be moved or displaced, such as personal goods; a tangible or intangible thing in which an interest constitutes personal property; specif., *anything that is not so attached to land as to be regarded as a part of it* as determined by local law."  Black's Law dictionary defines real property as "[l]and and anything growing on, *attached to, or erected on it*, excluding anything that may be severed without injury to the land."  Finally, it defines appurtenance as "[s]omething that belongs or *is attached to* something else; esp., *something that is part of something else* that is more important <the garden is an appurtenance to the land>."  While the Court does not hold that an item of "personal property" can never be considered a building, structure, oil line, gas line, appurtenance, or other improvement to real property under § 16-121(b), given the definitions of personal property, movable, real property, and appurtenance, and viewing the facts in the light most favorable to M&S, the Court concludes that a contract for the repair or maintenance of *personal property* will not likely be governed by § 16-121(b).  This conclusion does not preclude subsequent argument that the turbine in question constitutes a structure, appurtenance, or other improvement to real property for purposes of § 16-121(b); nor does it constitute a finding that the turbine is personal property.  Rather, the Court simply cannot conclude at this stage that the turbine constitutes a structure, appurtenance, or other improvement to real property for purposes of § 16-121(b).

facts sufficient to determine at this early stage that the turbine is a "structure, appurtenance, or other improvement to real property."  Indeed, to find that the turbine is a structure, appurtenance or other improvement to real property, the Court must necessarily draw inferences in GPGS's favor and make conclusions based on facts not contained in the pleadings or attachments thereto. Construing the well-pleaded facts in the light most favorable to M&S, as the Court must, the Court cannot say, as a matter of law, that the turbine at issue here constitutes a structure, appurtenance or other improvement to real property.

Ultimately, whether the subcontract qualifies as a contract as defined in § 16-121 depends on facts not currently before the Court.  M&S has alleged facts that, if true, suggest that the subcontract is not subject to § 16-121(b).  Because the Court cannot conclude that the subcontract at issue here meets the definition of a construction contract under § 16-121(a)(1) and thus, subject to § 16-121(b), the Court denies GPGS's motion to dismiss on this basis.

### B.    Kansas Common Law

GPGS also argues that the indemnification provision of the subcontract is unenforceable under Kansas common law.  Specifically, it argues that the indemnification provision of the subcontract is unclear and equivocal, and therefore, as a matter of public policy, cannot be construed under Kansas law to indemnify M&S for M&S's own negligent acts.

M&S, however, does not appear to limit its claim for indemnification in Counts I and II to indemnification arising from M&S's alleged negligence.  Indeed, Counts I and II appear to seek indemnification based on alleged wrongdoing attributable to GPGS.  M&S alleges that the wrongful actions and damages alleged in Sunflower's Complaint, if true, relate to responsibilities assigned to GPGS under the subcontract, and that GPGS supplied the transition bolts and lockplates that Sunflower alleges failed.  Sunflower's Complaint also alleges that GPGS breached

numerous duties in the provision of its services under the subcontract.  Because M&S seeks indemnification for actions and negligence allegedly attributable to GPGS, Counts I and II should not be dismissed for violating Kansas's public policy.

Further, even if Counts I and II merely sought indemnification for M&S's own negligent acts, dismissal of Counts I and II still would be improper at this stage.  Under Kansas law, indemnification agreements where "one party agrees to indemnify another for the indemnitee's own negligence are disfavored and as such must be expressed in 'clear and unequivocal language.' "[15]  A review of Kansas cases demonstrates, however, that whether a particular provision violates public policy depends on the specific circumstances presented.[16]  Accordingly, the Court declines to adopt the bright-line rule that GPGS appears to request—that an indemnification provision indemnifying a party for its own negligence violates Kansas public policy unless the provision also specifically references negligence.[17]  Viewing the well-pleaded

---

[15] *Neustrom v. Union Pacific R. Co.*, 156 F.3d 1057, 1062 (10th Cir. 1998) (quoting *Zenda Grain & Supply Co. v. Farmland Industries, Inc.*, 20 Kan. App. 2d 728, 894 P.2d 881, 887 (1995)).

[16] *See, e.g.*, *Bartlett v. Davis Corp.,* 219 Kan. 148, 547 P.2d 800, 806-07 (1976) (enforcing provision that did not reference negligence and noting that when construing a contract of indemnity, "courts must consider not only the language of the contract, but the facts and surrounding circumstances under which the contract was made"); *In re Shirk's Estate*, 186 Kan. 311, 350 P.2d 1, 13 (1960) (describing when a contract is void as against public policy and nothing that "[i]llegality from the standpoint of public policy depends upon the facts and circumstances of a particular case"); *Mid-Am. Sprayers, Inc. v. U.S. Fire. Ins. Co.*, 8 Kan. App. 2d 451, 660 P.2d 1380, 1387 (1983) ("We find the contract in the present case, *under the facts herein*, to be lawful and enforceable.") (emphasis added).

[17] Citing *Zenda*, GPGS argues that the provision here is void as against public policy for its failure to specifically reference negligence.  *Zenda*, however, "did not void all similar clauses which do not use the exact language" referenced by *Zenda*.  *Moler v. Melzer*, 24 Kan. App. 2d 76, 942 P.2d 643, 645 (1997).  And, while *Zenda* may indicate a best practice for parties drafting indemnification clauses, it did not hold that every clause without the word "negligence" is per se void.  *Zenda*, 894 P.2d at 888 (concluding that "to protect itself from its own negligence, malfeasance, or mismanagement, an entity must employ language *similar to* the clause in *Corral,*" advising drafters of hold harmless clauses to "look to that language and follow it carefully," and noting that the "type of language employed in the instant matter is not nearly as clear and unequivocal") (emphasis added).  At least one Kansas case has upheld the enforceability of a hold harmless clause relieving the other party of liability for its own negligence even though the clause did not specifically include the word negligence.  *See Mid-Am. Sprayers,* 660 P.2d at 1382 (enforcing hold harmless agreement for rental of airplane engine where lessee alleged that lessor negligently manufactured the engine).  The hold harmless clause in *Mid-Am. Sprayers*, stated:

facts in the light most favorable to M&S, the Court cannot at this stage conclude as a matter of law that Kansas public policy prohibits enforcement of the indemnification provision at issue here. Accordingly, the Court denies GPGS's motion to dismiss.

### IV.    Conclusion

Assuming the well-pleaded facts to be true and construing them in the light most favorable to M&S, the Court cannot conclude at this stage that the indemnification provision violates either K.S.A. § 16-121 or Kansas public policy.  Accordingly, the Court denies GPGS's motion to dismiss, and denies as moot M&S's motion to supplement its response to GPGS's motion to dismiss.

**IT IS THEREFORE ORDERED** that GPGS's Motion to Dismiss Counts I and II of Defendant M&S Steels, Inc.'s Crossclaims (Doc. 21) is **DENIED**.

**IT IS FURTHER ORDERED** that M&S's Motion for Leave to File First Supplement to its Response in Opposition to GPGS's Motion to Dismiss (Doc. 59) is **DENIED** as moot.

**IT IS SO ORDERED**.

Dated this 20th day of April, 2018.

Eric F Melgren

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

P&WC assumes no liability of any nature or kind for the performance, use, or operation of Said Property, and Lessee agrees to save P&WC, United Technologies Corporation, and their directors, officers and employees harmless from any liability, claims, actions, damages, whether arising in tort or otherwise, and expenses to or by third persons in connection with the use of Said Property. Lessee waives any claim to damages to its property or personnel arising out of the operation and use of Said Property.